UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  23-CR-80199-MARRA

UNITED STATES OF AMERICA,

     Plaintiff,

vs.

AMOS PATTERSON,

     Defendant.

_____/

## MOTION TO DISMISS INDICTMENT

The defendant, Amos Patterson, through undersigned counsel, hereby moves to dismiss the indictment pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, and in support thereof, states:

*First*, Title 18, United States Code Section 922(g)(1), either on its face or as applied to Mr. Patterson's specific case, violates the Second Amendment. *See New York State Rifle & Pistol Ass'n, Inc.* v. *Bruen*, 142 S. Ct. 2111 (2022) (upholding the constitutional right to carry a handgun in public, and ruling that restrictions on protected conduct must be consistent with America's historical tradition of firearm regulation.); *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (*en banc*) (vacating a § 922(g)(1) conviction because, as applied, there was no showing of a historical tradition of regulation); *United States v. Bullock*, Case No. 3:18-CR-165-CWR-FKB, 2023 WL 4232309 (S.D. Miss. June 28, 2023) (dismissing a § 922(g)(1)

charge for the same reason); *United States v. Taylor*, 2024 WL 245557 (S.D. Ill. 2024) (dismissing a § 922(g)(1) charge for the same reason).

*Second*, because § 922(g)(1) regulates purely instrastate conduct, its enactment exceeded Congress's Commerce Clause authority, and it is thus unconstitutional.

## FACTUAL BACKGROUND

On December 3, 2022, Palm Beach County Sheriff's Office ("PBSO") was allegedly dispatched to the Blue Boar Tavern in West Palm Beach, Florida in reference to suspicious persons in the parking lot with firearms. (DE 1: 4). When law enforcement arrived and approached on foot, a large crowd of individuals scattered and approximately ten vehicles exited the parking lot. (DE 1: 4). Additionally, approximately five males walked away from a dark colored Jeep. (DE 1: 4). Law enforcement approached the Jeep, shined a flashlight inside the unoccupied vehicle, and allegedly observed a pink and black pistol on the floorboard behind the drivers seat. (DE 1: 4).

A civilian questioned the officer about why he was shining a flashlight into his vehicle. (DE 1: 4). When allegedly informed of the pistol, the civilian allegedly told the officer that one of the guys he had given a ride to had opened the door, placed something inside the vehicle, and walked into the arcade when he heard police were coming. (DE 1: 4). This second person was allegedly identified as Mr. Patterson. (DE 1: 4). The civilian allegedly provided consent to search the vehicle. (DE 1: 4). The pistol and ammunition was recovered. (DE 1: 4). Subsequent DNA testing on swabs collected from the trigger and/or guard of the pistol allegedly provide very strong

support for the inclusion of Mr. Patterson as a possible contributor to the DNA profile. (DE 1: 5).

There is no allegation that the firearm was purchased in interstate commerce or that it was used in any commercial transaction.

At the time of the incident in this case, Mr. Patterson allegedly had previously been convicted in Florida of the following felonies: attempted burglary of a dwelling and possession of burglary tools (Palm Beach County: 2012CF008488A), burglary of a structure or conveyance (Palm Beach County: 2012CF013195A), two counts of dealing in stolen property and two counts of false verification of ownership (2014CF006690A), felon in possession of a firearm or ammunition and sale or possession of a firearm with serial number altered or removed (2017CF008303A), and felon in possession of a firearm or ammunition, possession of cocaine with intent to sell while in possession of a firearm, and escape from custody or work release (2018CF005387A).

## ARGUMENT

### I. BOTH ON ITS FACE OR AS APPLIED TO MR. PATTERSON, SECTION 922(g)(1) VIOLATES THE SECOND AMENDMENT

The Second Amendment provides, "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Last year, in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court for the first time set forth a general test for assessing the constitutionality of firearm restrictions in which it rejected means-ends

scrutiny and adopted a two-step "test rooted in the Second Amendment's text, as informed by history." 142 S. Ct. at 2127. Two principles underlie the test. F*irst*, where "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. *Second*, regulations on protected conduct may then only stand if the Government can "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Here, because Mr. Patterson's alleged conduct is covered by the plain text of the Second Amendment, and because the Government cannot demonstrate that § 922(g)(1) is— either facially, or alternatively, as applied to Mr. Patterson—consistent with America's historical tradition of firearm regulation, the indictment must be dismissed.

### A. The Second Amendment's plain text covers Mr. Patterson's alleged conduct. (Step One of the *Bruen* Analysis)

The plain text of the Second Amendment guarantees the right (1) "of the people," (2) "to keep and bear," (3) "arms." *Heller*, 554 U.S. at 579–95. Mr. Patterson's conduct falls squarely into each category, so it is presumptively protected.

#### 1. Mr. Patterson is among "the people" protected under the Second Amendment

As a preliminary matter, Mr. Patterson—a lifelong citizen and resident of the United States—is unambiguously part of "the people." In *District of Columbia v. Heller*, the Supreme Court stated that "the people" in the Second Amendment "unambiguously refers" to "*all* Americans" and "*all* members of the political community"—"*not an unspecified subset.*" 554 U.S. 570, 579–81 (2008) (emphasis

added). In fact, aside from in the Second Amendment, "[t]he unamended Constitution and the Bill of Rights use the phrase 'right of the people' two other times:" once "in the First Amendment's Assembly–and–Petition Clause" and again "in the Fourth Amendment's Search–and–Seizure Clause." *Heller, id.* at 579. Per *Heller*, the phrase has the same meaning each time, and "refers to a class of persons who are part of the national community or who have otherwise developed sufficient connections with this country to be considered part of that community." *Id.* at 580 (quoting *United States v. Verdugo–Urquidez,* 494 U.S. 259, 265 (1990)); ("'[T]he people' in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights").

This interpretation accords with the plain meaning of the word "people" at the time the Bill of Rights was adopted: "[t]he body of persons who compose a community, town, city or nation" – a term "comprehend[ing] all classes of inhabitants." II Noah Webster, *An American Dictionary of the English Language* (1828).

Moreover, just as the Second Amendment does not "draw ... a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S.Ct. at 2134, it also does not draw a felon/non-felon distinction. *United States v. Jimenez-Shilon,* 34 F.4th 1042, 1046 (11th Cir. 2022) (describing felons as "indisputably part of 'the people'" under the Second Amendment); *see also United States v. Meza-Rodriguez*, 798 F.3d 664, 671 (7th Cir. 2015) (holding that a person's criminal record is irrelevant in determining whether the person is among "the people" protected under the Second Amendment; noting that the amendment "is not limited to such on-again, off-again protections"); *Folajtar v. Attorney Gen. of the United States*, 980 F.3d 897, 912 (3d Cir.

2020) (Bibas, J., dissenting) ("Felons are more than the wrongs they have done. They are people and citizens who are part of 'We the People of the United States.'").

In view of these considerations, judges in this district and others have found that convicted felons are, in fact, part of "the people." *See, e.g., United States v. Pierre*, Case No. 1:22-CR-20321-JEM/Becerra, Report and Recommendations by Judge Becerra, DE 53:17-20 (S.D. Fla. Nov. 28, 2022) (concluding that a felon "is included in the Second Amendment's 'of the people'"); *United States v. Hester*, Case No. 22-20333-CR-Scola, DE 39:1-10, 27:2-12 (S.D. Fla. Jan. 27, 2023) (the same); *see also Range*, 69 F.4th at 103 ("*Heller* and its progeny lead us to conclude that Bryan Range remains among "the people" despite his 1995 false statement conviction.").

### 2. The right to "keep" and "bear" arms includes the right to possess a firearm outside the home

With regards to the Second Amendment's guarantee of a right to "keep" and "bear" arms, the Court recognized in *Heller* that the word "keep" means "[t]o have in custody" or to "retain in one's power of possession," and the word "bear" means to "carry." 554 U.S. at 582; 584. And *Bruen* in turn established that the right to "bear" arms includes carrying arms in public outside the home. 142 S. Ct. at 2134-35 ("To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections.") Thus, it is indisputable that Mr. Patterson's alleged possession of a firearm in a car is covered by the right to "bear" arms.

### 3. The right to keep and bear "arms" includes the right to possess both a handgun and ammunition

Finally, the term "arms" refers to "[w]eapons of offense, or armour of defense." *Heller*, 554 U.S. at 581. The Supreme Court has construed the term as "extend[ing]…to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. And the Court has specifically held that the term protects the right to possess "handguns," *id.* at 629, which *were* in "common use" at the founding. *Id.* at 627. Ammunition is likewise part of the "arms" protected by the Second Amendment because "ammunition is necessary for [] a gun to function as intended." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018); *Jackson v. City of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("without bullets, the right to bear arms would be meaningless").

Because Mr. Patterson's alleged conduct is squarely covered by a right of "the people" to "bear" "arms," it is presumptively protected by the Second Amendment.

## B. There is no historical tradition of firearm regulation to justify Mr. Patterson's disarmament under § 922(g)(1) in this case. (Step Two of the *Bruen* Analysis)

Where, as here, an individual's conduct is shown to be presumptively protected by the plain text of the Second Amendment, a restriction can only stand where the Government shows that such a restriction "is consistent with the Nation's historical tradition of firearm regulation," that is, the tradition in existence "when the Bill of Rights was adopted in 1791." *Bruen*, 142 S. Ct. at 2126. Here, the Government cannot meet that burden as to § 922(g)(1) generally, nor could it meet that burden as to Mr. Patterson, whose prior convictions are non-violent. *See Bullock*, 2023 WL 4232309, at *2 (finding no historical tradition to justify applying § 922(g)(1), which "was enacted

in 1938, not 1791 or 1868," to a person with aggravated assault and manslaughter convictions).

### 1. The Government bears the burden of showing a tradition

As a preliminary matter, *Bruen* prescribed two ways of conducting the required historical inquiry for regulations of presumptively protected conduct. *First*, where a statute is directed at a "longstanding" problem that "has persisted since the 18th century," *Bruen* directs a "straightforward" inquiry: if there is no historical tradition of "distinctly similar" regulation, the regulation at issue is unconstitutional. *Bruen*, 142 S. Ct. at 2131 (conducting this straightforward" inquiry to strike down New York's restriction on public carry of guns). *Second*, where a statute is directed at "unprecedented societal concerns or dramatic technological changes," or problems that "were unimaginable at the founding," then and only then are courts empowered to reason "by analogy." *Id.* at 2132. Both guns and felons were indisputably prevalent at the time the Bill of Rights was passed, rendering the problem addressed by § 922(g)(1) clearly "longstanding." In fact, prior to the American Revolution, many of the colonies were heavily populated with convicts that were sent there from England. *See, e.g.*, Encyclopedia Virginia, "Convict Labor during the Colonial Period," *available at* encyclopediavirginia.org/entries/convict-labor-during-the-colonial-period/ (last visited August 11, 2023) (noting that as of 1776, Virginia alone housed at least 20,000 British convicts). Notably, in 1751, Ben Franklin even wrote a satirical article entitled "Rattle-Snakes for Felons," criticizing the way England had been ridding itself of its felons by sending them to the colonies to grow their population, and

suggesting that rattlesnakes be sent back to England as "suitable returns for the human serpents sent us by our Mother Country." Bob Ruppert, "The Rattlesnake Tells the Story," JOURNAL OF THE AMERICAN REVOLUTION (Jan. 2015). And courts, recognizing this history, have analyzed the federal felon-in-possession law under the "straightforward" analysis directed by *Bruen*. *See, e.g. Range*, 69 F.4th at 106 (conducting the historical analysis and concluding that "the Government has not shown that the Nation's historical tradition of firearms regulation supports depriving Range of his Second Amendment right to possess a firearm.").

In assessing, by this straightforward analysis, whether the Government has met its burden to "establish the relevant tradition of regulation," this Court must apply the following three principles. *Bruen*, 142 S. Ct. at 2135, 2149 n.25. *First*, where, as here, a challenged regulation addresses a general societal problem that has persisted since the 18th century, that regulation is unconstitutional unless the Government shows a tradition of "distinctly similar historical regulation" since that time. *Id.* at 2126. *Second*, if there *is* "distinctly similar historical regulation," the Government must show that such regulation is prevalent, such that it "is consistent with the Nation's historical tradition of firearm regulation." *Id.* "[A] single law in a single State" is not enough; instead, a "widespread" historical practice "broadly prohibiting" the conduct in question is required. *Id.* at 2137-38; 2142-45 (expressing doubt that regulations in even three of the thirteen colonies "could suffice."). *Third*, a "longstanding" tradition is one that accounts for time. Per *Bruen*, "when it comes to interpreting the Constitution, not all history is created equal" because

"Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," which in the case of the Second Amendment, was in 1791. *Id.* at 2136.

In short, to meet the *Bruen* Step Two inquiry, there must be historical regulation "distinctly similar" to § 922(g)(1) that was prevalent and "longstanding," and that applied generally or specifically to those like Mr. Patterson. As is further described below, courts have been looking, but no such longstanding tradition exists.

### 2. The Government cannot meet its burden because there is no longstanding tradition of permanently depriving a felon—let alone one like Mr. Patterson—from possessing a firearm

The Third Circuit (sitting *en banc*) and the Southern District of Mississippi (Judge Carlton W. Reeves, Chair of the U.S. Sentencing Commission, presiding), in *Range* and *Bullock*, recently undertook analyses of the historical traditions relevant to § 922(g)(1) in light of *Bruen*, and both courts came to the same conclusion: that the federal felon-in-possession statute was unconstitutional as applied to the defendants in those cases. *Range*, 69 F.4th at 448 (invalidating § 922(g)(1) as applied to a person convicted of making false statements on a foodstamps application); *Bullock*, 2023 WL 4232309, at *1 (invalidating § 922(g)(1) as applied to a person convicted of aggravated assault and murder). Consistent with these cases, this Court should find that § 922(g)(1) is unconstitutional on its face, or unconstitutional as applied to Mr. Patterson, whose prior convictions are all non-violent. *See also United States v. Rahimi*, (5th Cir. 2023) (finding § 922(g)(8) facially unconstitutional, noting that the

"question presented in this case is *not* whether prohibiting possession of firearms by someone subject to a domestic violence restraining order is a laudable policy goal…[but] whether 18 U.S.C. § 922(g)(8), a specific statute that does so, is constitutional.") (*cert. granted* in *United States v. Rahimi*, 2023 WL 4278450 (June 30, 2023)).

*First*, federal law has only included a general prohibition on firearm possession for individuals convicted of crimes punishable by over a year beginning in 1961. *Range*, 69 F. 4th at 104 (citing An Act To Strengthen The Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961)). Even the earliest version of that statute, which applied exclusively to certain violent criminals, was only enacted in 1938, well after the Bill of Rights was adopted (1791) and also, to the extent it is relevant, well after the Fourteenth Amendment was enacted (1868). *Id.* (citing The Federal Firearms Act of 1938, Pub. L. No. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938)).

*Second*, looking beyond federal law, scholars and historians maintain that in fact, "no colonial or state law in eighteenth century America formally restricted"— much less prohibited, permanently and under pain of criminal punishment—"the ability of felons to own firearms." Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374 (2009); *accord* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 708 (2009) ("Though recognizing the hazard of trying to prove a negative, one can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I."); Royce de R.

Barondes, *The Odious Intellectual Company of Authority Restricting Second Amendment Rights to the "Virtuous"*, 25 Tex. Rev. L. & Pol. 245, 291 (2021) (noting the lack of "any direct authority whatsoever" for the view that felons were, "in the Founding Era, deprived of firearm rights"); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U.L. Rev. 1187, 1217 (2015) (describing claims that felon-in-possession statutes are consistent with the Second Amendment's original meaning as "speculation," noting "advocates of this view have not identified framing-era precedents to support their" claims); Adam Winkler, *Heller's Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("The Founding generation had no laws … denying the right [to possess firearms] to people convicted of crimes. Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding.").

*Third*, judges too have recognized that there is no historical tradition of permanent felon disarmament:

- The Third Circuit, sitting *en banc*, *see Range*, 69 F.4th at 104 (reversing a § 922(g)(1) conviction after (i) noting that even the earliest 1938 version of the law covered only those convicted of serious violent crimes like "murder, rape, kidnapping, and burglary," (ii) rejecting the Government's attempt to justify modern felony-status-based disarmament based on older laws disarming groups based on race, religion or political status, and (iii) rejecting the Government's argument that Founding Era traditions of punishing certain nonviolent offenders with death—which would, to be sure, be more serious than disarmament—did not mean there was a tradition of disarmament).

- Judge Reeves, in *Bullock*, 2023 WL 4232309 (dismissing a § 922(g)(1) charge against a 57-year-old who had been convicted of aggravated assault and manslaughter after a bar fight when he was 31, after undertaking an

exceptionally detailed review of the rationales on which courts had been upholding § 922(g)(1) charges after *Bruen* and ultimately finding that "[m]issing from [the Government's brief], in sum, is any example of how American history supports § 922(g)(1), much less the number of examples *Bruen* requires to constitute a well-established tradition.").

- Judge (now Justice) Barrett of the Seventh Circuit, *see Kanter*, 919 F.3d at 458 (canvassing the historical record of founding-era firearm regulations and concluding, "no[] historical practice supports a legislative power to categorically disarm felons because of their status as felons"); *id.* at 451 ("Founding-era legislatures did not strip felons of the right to bear arms simply because of their status as felons"); *id.* at 464 ("History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons.").

- Judge Tymkovich of the Tenth Circuit, *see United States v. McCane*, 573 F.3d 1037, 1047–49 (10th Cir. 2009) (Tymkovich, J., concurring) (questioning whether felon dispossession laws have a "'longstanding' historical basis," noting "recent authorities have *not* found evidence of longstanding dispossession laws" but instead show such laws "are creatures of the twentieth – rather than the eighteenth – century").

- Judge Traxler of the Fourth Circuit, *see United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("Federal felon dispossession laws … were not on the books until the twentieth century").

Evidently, courts have looked extensively and found no support for a "longstanding" historical tradition of gun bans on felons, and that is because no such tradition exists in this country. Thus, pursuant to *Bruen*, § 922(g)(1) is facially unconstitutional. But this Court need not reach so far—the issue in this case would be disposed with a ruling that there is no historical tradition to support application of § 922(g)(1) as to Mr. Patterson, a person who has never been convicted of a violent felony. Even assuming a portion of those prior convictions were based on constitutionally-appropriate restrictions on Mr. Patterson's Second Amendment rights, there is no tradition in this country that would suggest that those prior

convictions support a permanent ban on his possession of a firearm now. Section § 922(g)(1) is thus unconstitutional as applied.

## II. TITLE 18, UNITED STATES CODE SECTION 922(g) EXCEEDS CONGRESS' POWER UNDER THE COMMERCE CLAUSE BY ALLOWING THE FEDERAL GOVERNMENT TO REGULATE PURELY INTRASTATE CONDUCT THAT DOES NOT SUBSTANTIALLY EFFECT INTERSTATE COMMERCE

Mr. Patterson respectfully moves this Honorable Court to dismiss the indictment against him, because 18 U.S.C. § 922(g) exceeds Congress' limited powers under the Commerce Clause, both on its face and as applied to Mr. Patterson's alleged conduct in this case. Mr. Patterson recognizes that the Eleventh Circuit has rejected this claim. *United States v. McAllister*, 77 F.3d 387 (11th Cir. 1996) and *United States v. Scott*, 263 F.3d 1270 (11th Cir. 2001). Mr. Patterson therefore respectfully raises the following arguments in order to preserve this claim for further review.

### A. The Federal Government is one of limited and enumerated powers; the general police power resides in the States.

"[T]he principle that 'the Constitution created a Federal Government of limited powers,' while reserving a generalized police power to the States, is deeply ingrained in our constitutional history." *United States v. Morrison*, 529 U.S. 598, 607, 618 n.8 (2000) (citations and internal quotation marks omitted). In *United States v. Lopez*, 514 U.S. 549 (1995), then-Chief Justice Rehnquist explained:

> We start with first principles. The Constitution creates a Federal Government of enumerated powers. *See* Art. I, § 8. As James Madison wrote: "The powers delegated by the proposed Constitution are few and defined. Those which are to remain in the State governments are

numerous and indefinite." Federalist No. 45, pp. 292-293 (C. Rossiter ed. 1961). This constitutionally mandated division of authority "was adopted by the Framers to ensure protection of our fundamental liberties." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (internal quotation marks omitted). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse form either front." *Ibid.*

*Lopez*, 514 U.S. at 552.

By the Framers' intentional design, "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 617 (citation omitted). Hence, the federal government may enact and enforce criminal laws only insofar as they fall within one of Congress' specifically enumerated powers under Article I. *See Bond v. United States*, 572 U.S. 844, 876-77 (2014) ("'The Constitution confers upon Congress . . . not all governmental powers, but only discrete, enumerated ones.'") (alteration and citation omitted).

## B. Congress may not regulate noneconomic, intrastate criminal activity unless that activity "substantially affects" interstate commerce.

This case involves Congress' power "[t]o regulate Commerce . . . among the several States," under U.S. CONST. art. I, § 8, cl. 3. In *Lopez*, the Court surveyed the history of the Court's Commerce Clause jurisprudence and identified three broad categories of activities which Congress may regulate pursuant to the Clause: First, "Congress may regulate the use of the channels of interstate commerce." *Id.* Second, Congress may "regulate and protect the instrumentalities of interstate commerce, or

persons and things in interstate commerce." *Id.* Third, and relevant here, Congress may regulate "those activities having a substantial relation to interstate commerce, . . . *i.e.*, those activities that substantially affect interstate commerce." *Id.* at 558-559.

With respect to the third category, the Court acknowledged that its case law "has not been clear whether an activity must 'affect' or 'substantially affect' interstate commerce in order to be within Congress' power to regulate it under the Commerce Clause." *Id.* at 559 (citations omitted). The Court concluded that the proper analysis is whether the targeted activity "substantially affects" interstate commerce. *Id.*

In *Lopez*, the Court invalidated the Gun-Free School Zones Act, formerly codified at 18 U.S.C. § 922(q). The Court found that the Act was "a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 515 U.S. at 561. It was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* at 561. It contained "no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* And the Court found no congressional findings regarding the impact of intrastate firearms possession on interstate commerce. *Id.* at 562.

The Court rejected the government's argument that "the presence of guns in schools poses a substantial threat to the educational process" by threatening the learning environment, which would in turn result in a "less productive citizenry" and "have an adverse effect on the Nation's economic well-being." *Id.* at 564. The

government conceded that such reasoning would allow Congress to "regulate not only violent crime, but all activities that might lead to violent crime, regardless of how tenuously they relate to interstate commerce." *Id.* Following such reasoning, the Court found it "difficult to perceive any limitation on federal power, even in areas such as criminal law enforcement or education where States historically have been sovereign." *Id.* To accept the government's arguments would "convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States"; "require [the Court] to conclude that the Constitution's enumeration of powers does not presuppose something not enumerated"; and accept "that there will never be a distinction between what is truly national and what is truly local." *Id.* at 567-68 (citations omitted). "This" the Court was "unwilling to do." *Id.* at 568.

### C. *United States v. McAllister*, 77 F.3d 387 (11th Cir. 1996) *and United States v. Scott*, 263 F.3d 1270 (11th Cir. 2001), were wrongly decided.

Shortly after *Lopez* was decided, the Eleventh Circuit faced the question of whether 18 U.S.C. § 922(g) similarly exceeded Congress' authority under the Commerce Clause, and held that it did not. *United States v. McAllister*, 77 F.3d 387, 389 (11th Cir. 1996). The Eleventh Circuit found that § 922(g) was distinguishable from the section invalidated in *Lopez* (§ 922(q)), based on the presence of the statutory jurisdictional element:

> The [*Lopez*] Court relied on the fact that [§ 922(q)] "by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." 514 U.S. at ---, 115 S. Ct. at 113. In contrast, § 922(g) makes it unlawful for a felon to possess 'in or affecting commerce," any firearm or ammunition. 18 U.S.C. §

922(g) (emphasis added). This jurisdictional element defeats McAllister's facial challenge to the constitutionality of § 922(g)(1).

*McAllister*, 77 F.3d at 389-90 (footnote omitted). The court also denied McAllister's as-applied challenge to the statute. Specifically, the Court rejected McAllister's argument "that *Lopez* marks a significant change, rendering suspect the 'minimal nexus' requirement established by the Court in *Scarborough*." 77 F.3d at 390.

In *Scarborough v. United States*, 431 U.S. 563 (1977), the Court held that proof that a firearm had previously traveled in interstate commerce was sufficient to satisfy the requirement, under the predecessor statute to § 922(g), that a defendant had possessed a firearm "in commerce or affecting commerce." The Court found that, in drafting the statute, "Congress intended no more than a minimal nexus requirement." *Id*. at 577. The case was decided, however, purely an issue of statutory construction: "The issue [was] whether proof that the possessed firearm previously traveled in interstate commerce is sufficient to satisfy the statutorily required nexus between the possession of a firearm by a convicted felon and commerce." *Id*. at 564 (emphasis added).

Nonetheless, the *McAllister* Court found that "nothing" in the Supreme Court's constitutional holding in *Lopez* suggested that held the statutory ruling in Scarborough "should be changed:"

> In contrast to § 922(q), § 922(g) is an attempt to regulate guns that have a connection to interstate commerce; the statute explicitly requires such a connection. When viewed in the aggregate, a law prohibiting the possession of a gun by a felon stems the flow of guns in interstate commerce to criminals. Nothing in *Lopez* suggests that the 'minimal nexus' test should be changed.

*McAllister*, 77 F.3d at 390.

Five years later, the appellant in *United States v. Scott*, 263 F.3d 1270, 1271 (11th Cir. 2001), argued that *McAllister*'s holding had been abrogated by the intervening decisions in *United States v. Morrison*, 263 F.3d 1270 (2000), and *Jones v. United States*, 529 U.S. 848 (2000).

In *Morrison*, the Court held that part of Violence Against Women Act, which prohibited intrastate gender-related violence, exceeded Congress' power under the Commerce Clause. 529 U.S. at 617-18. The Court reaffirmed that "[t]he Constitution requires a distinction between what is truly national and what is truly local," and that the regulation of violent crime is traditionally a matter for the States. *See id.* at 619. The Court also "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 618.

In *Jones*, the Court held that a private dwelling, not used for any commercial purpose, did not fall within the ambit of the federal arson statute, 18 U.S.C. § 844(i). *Jones*, 529 U.S. at 855. The Court rejected the government's argument that the building was "used" in commerce because the owner "used" the residence as collateral to obtain a loan, and "used" the residence to obtain a casualty insurance policy. The qualification that the building is "used" in an activity affecting commerce, the Court held, "is most sensibly read to mean active employment for commercial purposes, and not merely a passive, passing, or past connection to commerce." *Id.* at 855.

The Court again expressed concern that adopting the government's argument

would eliminate the distinction between state and federal activities:

> Were we to adopt the Government's expansive interpretation of § 844(i), hardly a building in the land would fall outside the federal statute's domain. Practically every building in our cities, towns, and rural areas is constructed with supplies that have moved in interstate commerce, served by utilities that have an interstate connection, financed or insured by enterprises that do business across state lines, or bears some other trace of interstate commerce. . . . If such connections sufficed to trigger § 844(i), the statute's limiting language, 'used in' any commerce-affecting activity, would have no office.

*Id.* at 857.

Although the case was ultimately decided as a matter of statutory construction, the Court found its interpretation was appropriate, "[g]iven the concerns brought to the fore in *Lopez*," and the constitutional questions that would arise if the "'traditionally local criminal conduct,' in which petitioner Jones engaged," were rendered "a matter for federal enforcement." *Jones*, 529 U.S. at 858 (citation omitted).

In *Scott*, the Eleventh Circuit held that "nothing in *Morrison* or *Jones* alters the reasoning upon which *McAllister* is moored;" that *McAllister* "relied on the jurisdictional element of § 922(g) to sustain the statute under *Lopez*;" and that *Morrison* did not compel a different result. *Scott*, 263 F.3d at 1274. The opinion did not address *Morrison*'s repudiation of the 'aggregate effects' theory, on which the *McAllister* opinion also relied. *See McAllister*, 77 F.3d at 390 ("When viewed in the aggregate, a law prohibiting the possession of a gun by a felon stems the flow of guns in interstate commerce to criminals."). The court held that "*Jones*[] purely statutory holding likewise does not alter *McAllister*." *Scott*, 263 F.3d at 1274.

Hence, despite the facts that (1) *Scarborough* similarly approved of a "minimal

nexus" test solely as a matter of statutory construction; (2) *Lopez* held, as a matter of constitutional law, that noneconomic intrastate activity may only be federally regulated if it substantially affects interstate commerce; and (3) *Morrison* expressly rejected of the aggregate "costs of crime" rationale invoked in *McAllister*, the Eleventh Circuit continues to hold that a conviction under § 922(g) may rest on a minimal nexus to interstate commerce. These holdings simply cannot be squared with the holdings of *Lopez* and *Morrison*, or the analysis in *Jones*. The Supreme Court has clearly held that Congress may not regulate noneconomic, intrastate criminal activity unless that activity "substantially affects" interstate commerce. A statutory element requiring a minimal nexus to commerce is insufficient to overcome these constitutional rulings. The Eleventh Circuit's precedents holding otherwise are contrary to Supreme Court authority, and should be overruled.

### D. Numerous circuit judges (and two Supreme Court Justices) have called for a reexamination of the issue herein.

Although the Circuit Courts of Appeals have generally agreed that *Lopez* left *Scarborough* intact, there has long been a chorus of dissenting voices from judges around the country, expressing doubt as to the constitutionality of § 922(g).

In *United States v. Rawls*, 85 F.3d 240, 242 (5th Cir. 1996), a panel of the Fifth Circuit hesitantly ruled that it was bound by *Scarborough* to affirm § 922(g)(1). However, all three members of the *Rawls* panel joined in a specially concurring opinion expressing significant doubt as to the constitutionality of the statute. *See Rawls*, 85 F.3d at 243 (Garwood, J., joined by Weiner, and E. Garza, J.J., specially

concurring) ("If the matter were *res nova*, one might well wonder how it could rationally be concluded that the mere possession of a firearm in any meaningful way concerns interstate commerce simply because the firearm had, perhaps decades previously before the charged possessor was even born, fortuitously traveled in interstate commerce."). Another judge of the Fifth Circuit later disagreed with the *Rawls* panel's treatment of *Scarborough*, and opined that "the precise holding in *Scarborough* is in fundamental and irreconcilable conflict with the rationale of" *Lopez. See United States v. Kuban*, 94 F.3d 971, 976, 977-78 (5th Cir. 1996) (DeMoss, J., dissenting in part) (finding that "[t]he 'minimal nexus' of *Scarborough* can no longer be deemed sufficient under the *Lopez* requirement of substantially affecting interstate commerce").

In the Ninth Circuit, four judges dissented from the denial of rehearing in a case involving a similarly-worded statute prohibiting the possession of body armor, 18 U.S.C. § 931. *United States v. Alderman*, 593 F.3d 1141 (9th Cir. 2010) (O'Scannlain, J., dissenting from the order denying rehearing en banc, joined by Paez, Bybee, and Bea, Circuit Judges). Judge O'Scannlain wrote:

> The majority opinion allows Congress to punish possession offenses, as long as the enacting statute includes a mere recital purporting to limit its reach to good sold or offered for sale in interstate commerce. The majority's opinion makes *Lopez* superfluous. Insert a jurisdictional recital, the majority in effect says, and Congress need not worry about whether the prohibited conduct has a 'substantial relation to interstate commerce.'

*Id.* (citation omitted). When the case reached the Supreme Court, Justice Thomas echoed these concerns in an opinion dissenting from the denial of certiorari:

> Joining other Circuits, the Court of Appeals for the Ninth Circuit has decided that an "implic[it] assum[ption] of constitutionality in a 33-year old statutory interpretation opinion "carve[s] out" a separate constitutional place for statutes like the one in this case and pre-empts a "careful parsing of post-*Lopez* case law." 565 F.3d 641, 645, 647, 648 (2009) (citing *Scarborough v. United States*, 431 U.S. 563 . . . (1977)). That logic threatens the proper limits on Congress' commerce power and may allow Congress to exercise police powers that our Constitution reserves to the States.

*Alderman v. United States*, 562 U.S. 1163 (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari).

More recently, seven judges of the Fifth Circuit voted in favor of rehearing *en banc* the same constitutional challenge to § 922(g) presented herein. *See United States v. Seekins*, 52 F.4th 988 (5th Cir. 2022) (noting that seven judges voted in favor of rehearing *en banc* and nine voted against), *cert. denied*, No. 22-6853 (U.S., June 23, 2023).

These dissenting and specially concurring judges are correct. The Eleventh Circuit's precedents affirming § 922(g) are out of line with Supreme Court authority, and should not be followed. Mr. Patterson's alleged possession of the firearm had no effect on interstate commerce whatsoever, let alone the "substantial" effect that the Supreme Court's Commerce Clause precedents require. Title 18 U.S.C. § 922(g) is unconstitutional both on its face and as applied to Mr. Patterson's alleged conduct, and the indictment should be dismissed.

## CONCLUSION

For the foregoing reasons, because § 922(g)(1) violates the Second Amendment and Commerce Clause, or alternatively, because the statute at the very least cannot be applied to Mr. Patterson's conduct without running afoul of his Second Amendment rights, this Court should dismiss the indictment.

Respectfully submitted,

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

By: *s/M. Caroline McCrae*
M. Caroline McCrae
Assistant Federal Public Defender
Attorney for Defendant
Florida Bar No. 72164
250 S Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Phone: (561) 833-6288
Email: caroline_mccrae@fd.org

### CERTIFICATE OF SERVICE

I HEREBY certify that on January 24, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*s/M. Caroline McCrae*
M. Caroline McCrae